**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                            CR 18-3413 KG/CG

JADE TIFFANY LAUREZO,

     Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court on Defendant Jade Tiffany Laurezo's *Motion to Suppress Statements*, (Doc. 27), filed November 27, 2018, and the *United States' Response to Defendant's Motion to Suppress Statements*, (Doc. 34), filed December 18, 2018. On December 19, 2018, United States District Judge Kenneth J. Gonzales referred this matter to the undersigned to make findings of fact, conduct legal analysis, and recommend an ultimate disposition. (Doc. 35). On February 12 and 13, 2019, the Court held an evidentiary hearing. (Doc. 49); (Doc. 50); (Doc. 51). Following the hearing, both Ms. Laurezo and the Government submitted proposed findings of fact and conclusions of law. (Doc. 56); (Doc. 58).

After considering the parties' filings, the record, and the relevant law, the Court **RECOMMENDS** that Ms. Laurezo's *Motion to Suppress Statements*, (Doc. 27), be **DENIED**.

### I.    Statement of Facts

#### a.   Ms. Laurezo's Background & Relationship with Dain Adams

Ms. Laurezo is a native of the Philippines and speaks two native Filipino languages, Tagalog and Karay-a. (Doc. 56 at 1). She also speaks "broken" English and

at times she has trouble expressing herself. *Id.* Ms. Laurezo has a bachelor's degree in avionics technology from a university in the Philippines and she was previously employed as an aircraft mechanic instructor. (Doc. 50 at 52); (Doc. 58 at 13). Prior to the commencement of the criminal investigation underlying this case, Ms. Laurezo had no experience with the American criminal justice system. (Doc. 50 at 34); (Doc. 56 at 2).

In early June 2017, Ms. Laurezo met Dain Adams, a United States citizen, through an online dating application called Tinder. (Doc. 50 at 7); (Doc. 58 at 2). In August 2017, Ms. Laurezo travelled to the United States for a brief visit to meet Dain Adams and his family. (Doc. 58 at 2). Between June 2017 and July 2018, the couple communicated regularly using Viber, an internet messaging application. (Doc. 50 at 7-8); (Doc. 58 at 2). Dain Adams and Ms. Laurezo sent messages on Viber in English, with a few Tagalog words "here and there." (Doc. 50 at 8); (Doc. 58 at 2).

In March 2018, Ms. Laurezo returned to the United States to live temporarily with Dain Adams and his parents, Donnie and Marsha Roberson, at their home in Roswell, New Mexico. (Doc. 58 at 2-3). While in the United States, Ms. Laurezo studied in pursuit of a Federal Aviation Administration certificate to train aircraft maintenance personnel for U.S. based customers. *Id.* at 10. Over the course of her three-month visit, Ms. Laurezo developed a close relationship with Dain Adams' parents and referred to Donnie Roberson as "Dad" and Marsha Roberson as "Mom." (Doc. 50 at 44); (Doc. 58 at 3) (citing Doc. 50 at 30-31) (as Donnie Roberson testified, "We [the Robersons] welcomed her into our home whenever she and my son developed a relationship. She was a part of our family.").

b.  The June 2018 Search and July 2018 Request for an Interview

On June 27, 2018, law enforcement officials from the Chaves County Sheriff's Department executed a search warrant in connection with a child pornography investigation being conducted at the Roberson's 3809 Zinnia Road residence in Roswell, New Mexico. (Doc. 51 at 25). Upon arrival, law enforcement knocked and announced their presence and were met at the front door by Marsha Roberson. (Doc. 58 at 2). Ms. Laurezo and the Robersons were ordered to stand outside of the residence while the officers conducted their search. (Doc. 56 at 2). Eight law enforcement officers entered the premises to execute the warrant, aiming their handguns and assault rifles at Ms. Laurezo and the Robersons. (Doc. 50 at 24, 34); (Doc. 56 at 2). After seizing a number of electronic devices, including Ms. Laurezo's Samsung DUOS cellphone, the occupants were permitted to return inside. *Id.* Before leaving, the officers confirmed that Dain Adams lived at the residence but was not at home at the time of the search. (Doc. 56 at 2); (Doc. 58 at 2).

On July 3, 2018, Sergeant Hector Ramirez and Deputy Will Seely with the Chaves County Sherriff's Department returned to the 3809 Zinnia Road residence to inquire if Ms. Laurezo would consent to an interview with law enforcement officials at the Sheriff's Department. (Doc. 50 at 23-24); (Doc. 56 at 2). Ms. Laurezo recognized Deputy Seely as one of the law enforcement officers who pointed a gun at her when the 3809 Zinnia Road residence was searched on June 27, 2018. (Doc. 50 at 37); (Doc. 56 at 2). When Deputy Seely and Sergeant Ramirez returned to the 3809 Zinnia Road residence in their police uniforms, Ms. Laurezo was afraid and did not know what was happening. (Doc. 50 at 37-38); (Doc. 56 at 2). After conferring with Donnie Roberson,

3

Ms. Laurezo agreed to speak with law enforcement at the Sheriff's Department. (Doc. 50 at 24); (Doc. 56 at 2). Although she was offered a ride by Deputy Seely, Ms. Laurezo chose to drive separately with Donnie Roberson. (Doc. 50 at 24-25); (Doc. 56 at 2-3).

After confirming that Ms. Laurezo would meet them at the Sheriff's Department, Sergeant Ramirez and Deputy Seely waited outside for approximately 15 minutes in two separate marked patrol units for Ms. Laurezo and Donnie Roberson to leave the house. (Doc. 56 at 3); (Doc. 58 at 4). Ms. Laurezo testified that before going to the Sheriff's Department, she wanted to visit her neighbor's house to use the telephone. (Doc. 50 at 39); (Doc. 56 at 2). Law enforcement officials had seized all the electronic devices capable of accessing the internet from the 3809 Zinnia Road residence, leaving Ms. Laurezo unable to communicate with anyone outside the residence. (Doc. 56 at 2); (Doc. 50 at 37-38) (Ms. Laurezo testified, "[F]rom June 27th until that day, I don't have contact with anybody, because I don't have my phone with me. I don't have phones at home. And I can't tell my family what happened about that day when I was so afraid, when they pointed gun at me…."). Despite her desire to use the telephone, Ms. Laurezo was intimidated by the presence of law enforcement officers waiting for her and she felt she had to immediately proceed to the Sheriff's Department. (Doc. 56 at 2). She ultimately decided to forego a visit to her neighbor's home and instead proceeded directly to the Sheriff's Department. *Id.*

As they drove, Donnie Roberson took a number of turns that were outside the direct route, in an attempt to see if law enforcement would follow their vehicle. (Doc. 50 at 25); (Doc. 56 at 2). Despite Donnie Roberson's choice of route, Sergeant Ramirez followed the vehicle in his marked patrol unit until Ms. Laurezo was dropped off at the

Sheriff's Department. *Id.* Donnie Roberson testified that he thought if he did not drive to the Sheriff's Department to deliver Ms. Laurezo, law enforcement officials would have forced Ms. Laurezo to drive with them. (Doc. 50 at 25).

c. The July 2018 Interview with Law Enforcement

Prior to Ms. Laurezo's arrival at the Sheriff's Department, Detective Valderaz contacted Supervisory Detention and Deportation Officer Subia to determine whether criminal charges would affect her visa status. (Doc. 58 at 3). When she arrived, Ms. Laurezo was instructed to wait in the receiving area. (Doc. 50 at 40); (Doc. 56 at 2). Sergeant Ramirez then escorted Ms. Laurezo to an interview room in a secure area of the building and closed the door. (Doc. 50 at 40-41). Shortly thereafter, immigration officials entered the room and questioned Ms. Laurezo for fifteen to twenty-five minutes, inquiring about the nature of her visit to the United States. (Doc. 50 at 43); (Doc. 56 at 2). The immigration officials never read Ms. Laurezo her *Miranda* rights and never explained their purpose in questioning her. (Doc. 50 at 41-42); (Doc. 56 at 4); (Doc. 58 at 4). The officials never told Ms. Laurezo why she had been called to the Sheriff's Department and proceeded to ask personal questions about her family, marital status, children, and criminal history. (Doc. 50 at 41-43); (Doc. 58 at 4). During the interview, Ms. Laurezo asked to use the restroom and was accompanied by a uniformed law enforcement official. (Doc. 50 at 48, 64-65); (Doc. 56 at 7).

After her interview with the immigration officials, Ms. Laurezo was escorted to another room in the Sheriff's Department where Detective Valderaz and Sergeant Perham were seated awaiting her arrival. (Doc. 50 at 43-44). Ms. Laurezo recognized both Detective Valderaz and Sergeant Perham as two of the men that had participated

5

in the execution of the search warrant and pointed a gun at her. *Id.*; (Doc. 56 at 4). Detective Valderaz and Sergeant Perham questioned Ms. Laurezo for roughly one hour and forty minutes. (Doc. 56 at 7); (Doc. 58 at 11).

Throughout the interview, Ms. Laurezo expressed confusion about her *Miranda* rights and the American criminal justice system. (Doc. 50 at 45-47); (Doc. 56 at 4). After being presented with the Advice of Rights form, Ms. Laurezo stated, "I don't understand this. I-to be honest, I-I feel like I don't know because-yeah. I think-what will be the consequences if I talk to you is again?" (Doc. 56 at 6). When asked by Sergeant Perham, "Do you know what your rights are while you're in this country," Ms. Laurezo responded, "I'm here for a visit and to take exams." *Id.* at 5.

Ms. Laurezo later testified that she did not feel free to leave and she did not understand the Advice of Rights form the officers read to her. (Doc. 50 at 45-48); (Doc. 56 at 5). In addition, Ms. Laurezo asked Detective Valderaz to explain the meaning of the words "graduate" and "rapport." (Doc. 56 at 7). After the interview, Ms. Laurezo stated she also did not understand the meaning of the terms "court of law," "imprisonment," "trial," or "attorney." *Id.* at 5. When asked why she did not terminate the interview or leave, she explained, "This is my first time that I was in this situation. And in my country, if you are – if the police – or you're in a room and you are talking to a police, it's a sign of disrespect if you stop or if you just leave. So at that time, I was waiting for them to just say, 'Okay. This is done. This is over.'" (Doc. 50 at 47-48); (Doc. 56 at 7).

Eventually, Ms. Laurezo signed a waiver relinquishing her *Miranda* rights and agreed to talk with the detectives. (Doc. 36-1 at 15-16). During the interview, Ms.

Laurezo made inculpatory remarks regarding video evidence found on her Samsung

DUOS cellphone. (Doc. 36-1 at 56, 70-77). At the close of the interview, Ms. Laurezo

was placed under arrest for possession of child pornography. (Doc. 36-1 at 114-15).

## II.    Procedural Posture

On October 17, 2018, a federal grand jury returned an indictment charging Ms.

Laurezo with one count of Production of Visual Depictions of a Minor Engaging in

Sexually Explicit Conduct, in violation of 18 U.S.C. § 2251(a),(e) and § 2256, and one

count of Possession or Access with Intent to View Visual Depictions of Minors Engaged

in Sexually Explicit Conduct, in violation of 18 U.S.C. § 2252A(a)(5)(B), (b)(2) and §

2256. (Doc. 20); (Doc. 21). At her arraignment on November 6, 2018, Ms. Laurezo pled

not guilty to both counts and the case was assigned to the Honorable Kenneth J.

Gonzales. (Doc. 23). Shortly thereafter, on November 27, 2018, Ms. Laurezo filed the

present motion to suppress her statements from the July 3, 2018, interview with law

enforcement. (Doc. 27).

## III.    Analysis

Ms. Laurezo argues that her statements made to law enforcement officers on

July 3, 2018, should be suppressed because she was subjected to a custodial

interrogation and she did not voluntarily, knowingly, and intelligently waive her *Miranda*

rights. (Doc. 27 at 2-5). In response, the Government alleges Ms. Laurezo was not in

custody during the interview, and as such her statements are not protected by the Fifth

Amendment. (Doc. 34 at 4-6). Even if she was in custody, the Government argues, Ms.

Laurezo knowingly, voluntarily, and intelligently forfeited her *Miranda* rights and chose

to speak with law enforcement. (Doc. 34 at 6-9).

a.  Custodial Interrogation

For inculpatory statements to be suppressed, the defendant must demonstrate that her Fifth Amendment rights have been violated. *Miranda v. Arizona*, 384 U.S. 436, 460-61 (1966). The Fifth Amendment of the United States Constitution protects an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. This protection is afforded to all individuals when they are subject to custodial interrogation. *Miranda*, 384 U.S. at 444. An individual is "in custody" if they are "under formal arrest" or have their "freedom of action . . . curtailed to a degree associated with formal arrest." *United States v. Cash*, 733 F.3d 1264, 1276 (10th Cir. 2013) (citations omitted).

In determining whether an individual is in custody, a court should consider "two distinct inquiries:" (1) "the circumstances surrounding the interrogation" and (2) "if, given those circumstances . . . a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (citation omitted). This inquiry "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

In accordance with the framework set forth by the United States Supreme Court in *J.D.B.*, the Court will first identify the relevant circumstances surrounding Ms. Laurezo's interrogation. *See J.D.B.*, 564 U.S. at 270. To begin, law enforcement officials came to the home where Ms. Laurezo was staying and asked her to accompany them to the Sheriff's Department. (Doc. 27 at 1). Upon their arrival, Ms. Laurezo recognized Officer Seely as one of the officers who pointed a gun at her while executing the search

8

warrant the week before. (Doc. 50 at 43-44); (Doc. 56 at 4). Although the Government

posits that Officer Seely was "friendly" and "never put any time constraints on how

quickly [Ms. Laurezo] needed to get to the station," he also waited at the end of the

driveway for her to depart. (Doc. 50 at 55, 56); (Doc. 56 at 3).

     Next, at least one marked police car followed Ms. Laurezo for the entirety of her

drive to the Sheriff's Department. (Doc. 56 at 3). Donnie Roberson, the driver of the

vehicle, testified that he deliberately took an indirect route in an attempt to determine if

they were truly free to ignore law enforcement's request to meet them at the Sheriff's

Department. (Doc. 50 at 25). Before Ms. Laurezo arrived at the Sheriff's Department,

Detective Valderaz had already contacted immigration officials to see if she would be

subject to removal proceedings if she was placed under arrest. (Doc. 56 at 6). Detective

Valderaz had already searched Ms. Laurezo's phone, believed she was in possession

of child pornography, and likely already intended to charge her with a crime, even

before she arrived at the Sheriff's Department. *Id.*

     Ms. Laurezo participated in two interviews at the Sheriff's Department. During

Ms. Laurezo's first interview with immigration officials, one official stood against the wall

while two others sat at a table with her. (Doc. 50 at 41). The immigration officials

proceeded to ask her highly personal and "embarrassing" questions, like if she was

pregnant. *Id.* When Ms. Laurezo was finished being questioned by immigration officials,

a law enforcement officer escorted her to a second interview room. (Doc. 55 at 43).

Similarly, the second interview with law enforcement officials investigating Ms.

Laurezo's possible possession of child pornography was conducted by two male officers

who asked personal questions about Ms. Laurezo's sexual preferences. *Id.* Ms. Laurezo

later testified that she did not understand the distinction between the immigration officials and the detectives who were tasked with investigating her potential possession of child pornography. (Doc. 50 at 39-42). Rather, Ms. Laurezo thought she was being questioned by two different sets of police officers and she was never informed why she was being questioned by the immigration officials or what their purpose was in questioning her. *See id.* at 42 ("I don't know who they are. I just know that they are sheriffs, because I am in the Sheriff's Office. So I'm thinking that they're all sheriffs.").

Next, when Ms. Laurezo asked to use the restroom, she was escorted by a uniformed officer. (Doc. 56 at 7). In addition, both interviews were conducted in a secure area of the Sheriff's Department in small rooms with the door closed. *Id.* at 12. There were no windows in the interview rooms. *Id.* at 12-14. Each time Ms. Laurezo was asked to wait for law enforcement officials, she was placed alone inside a room with the door closed. (Doc. 50 at 43).

In light of the circumstances described above, an individual in Ms. Laurezo's position would not have felt she was at liberty to terminate the interrogation. *See Miranda*, 384 U.S. at 455 (opining that the principle psychological factors contributing to a successful interrogation were "isolation and unfamiliar surroundings" and "to be alone with the subject."); *see also United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008) (analyzing whether the defendant was interviewed in a "police dominated" atmosphere, including whether "the suspect was separated from his family and isolated in a nonpublic room, whether there was the threatening presence of several officers, whether there was any display of weapons or physical contact with the suspect, and

whether the officer's language and tone indicated that compliance might be compelled.")
(internal citation omitted).

Indeed, based on law enforcement's behavior in ensuring Ms. Laurezo's arrival at
the Sheriff's Department, the average person likely would not have believed they had
the liberty to decline the invitation to come in for questioning. In addition, an individual in
Ms. Laurezo's position would have likely felt outnumbered and intimidated when being
questioned by three male immigration officials, one of whom stood throughout the
duration of the interview, as they asked prying and intimate questions. A reasonable
person may not be able to discern the role of different uniformed officers for purposes of
distinguishing them as immigration officials or detectives. A person in Ms. Laurezo's
position may have lacked an understanding of the different purposes each interview
sought to achieve and may have perceived both interviews as being conducted by
police officers for investigative purposes.

While each of the above considerations in isolation may not be dispositive on the
issue of custody, together they support Ms. Laurezo's contention that the average
person would not genuinely believe they were free to refuse law enforcement's request
to stay and answer questions. *See J.D.B.*, 564 U.S. at 278 ("[W]e ask whether the
objective circumstances 'add up to custody,' instead of evaluating the circumstances
one by one.") (internal citation omitted); *Chee*, 514 F.3d at 1112 ("This is a fact intensive
inquiry focusing on the totality of the circumstances."). Under the circumstances
surrounding the interrogation, a reasonable person likely would have felt that he or she
was not "at liberty to terminate the interrogation and leave." *See id.* at 270. Indeed, Ms.
Laurezo was essentially escorted from the home where she was staying all the way to

the interview room where she was questioned by law enforcement officials. The constant oversight of law enforcement from the moment they arrived at the home—from following behind her car, to escorting her to the bathroom and between interview rooms—would make a reasonable person think they could not defy law enforcement's request to stay and talk.

The Government's argument to the contrary relies on the incorrect assertion that "[n]either Detective Valderaz nor Sergeant Perham went to 3809 Zinnia Road and told [Ms. Laurezo] that she needed to come to the sheriff's office. On the contrary, Defendant showed up at the station by her own free will and not at the request of any law enforcement officer." (Doc. 34 at 5). The Government later corrected this argument, agreeing that law enforcement officers went to the home where Ms. Laurezo was staying to ask if she would submit to police questioning. *See generally* (Doc. 44).

In sum, the facts of this case illustrate that an individual in Ms. Laurezo's position likely would not feel that they had the liberty to refuse to accompany law enforcement to the Sheriff's Department nor, once they arrived, the liberty to leave. Thus, because Ms. Laurezo was in custody at the time of the police interrogation, she was protected by the Fifth Amendment. As such, in order for her statements to be admissible at trial, Ms. Laurezo must have knowingly, voluntarily, and intelligently waived her *Miranda* rights.

b. Waiver of *Miranda* Rights

Ms. Laurezo next argues that the statements she made after signing the "Advice of Rights" form were "not voluntarily made because [her] first language is Tagalog and she did not understand her rights." (Doc. 27 at 6). In response, the Government argues that Ms. Laurezo's waiver was made knowingly, voluntarily, and intelligently. (Doc. 58 at

18). Neither party contends that Ms. Laurezo was not read and provided a written form explaining her *Miranda* rights. Rather, the parties' dispute centers around whether Ms. Laurezo understood her rights to such a degree that she could have voluntarily waived them.

When an individual is in custody, they may waive their Fifth Amendment protections if their decision to do so is done "voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444. The Government bears the burden of proving that an individual's waiver of *Miranda* rights was both knowing and voluntary. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). In reviewing an individual's decision to waive their constitutional rights, the court must examine "the surrounding circumstances and the entire course of police conduct with respect to the suspect." *Oregon v. Elstad*, 470 U.S. 298, 318 (1985). In addition, the court must consider the particular facts and circumstances of the case, "including the background, experience, and conduct of the accused." *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008).

The Tenth Circuit Court of Appeals has identified five factors to consider when weighing the voluntariness of an individual's interaction with law enforcement: "(1) the age, intelligence, and education of the defendant; (2) the length of [any] detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his or] her constitutional rights; and (5) whether the defendant was subjected to physical punishment." *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1153 (10th Cir. 2006). Ultimately, the Government must prove that the defendant's waiver was "the product of a free and deliberate choice rather than intimidation, coercion or deception," and that they understood both "the nature of the right being abandoned" and the "consequences

of the decision to abandon it." *United States v. Morris*, 287 F.3d 985, 988 (10th Cir. 2002) (citations omitted).

In beginning this analysis, the Court will highlight "particular facts and circumstances" that inform the calculus of whether Ms. Laurezo voluntarily, knowingly, and intelligently waived her Fifth Amendment rights. *See Burson*, 531 F.3d at 1256. First, the Court will examine Ms. Laurezo's age, education, and intelligence, in accord with the Tenth Circuit's five-factor test articulated in *Carrizales-Toledo*. *See* 454 F.3d at 1153. Ms. Laurezo received a bachelor's degree from the Philippine Air Transport and Training Services College of Aeronautics and has an aviation license that authorizes her to train aircraft mechanic personnel in the Philippines. (Doc. 50 at 52); (Gov. Ex. 55). Ms. Laurezo was visiting the United States to study and complete a Federal Aviation Administration ("FAA") certification test, which is a "technical" test conducted in English. (Doc. 50 at 53). By all accounts, Ms. Laurezo is a "very educated individual," with a "fairly technical degree." *Id.* at 52.

Ms. Laurezo is a 34-year-old woman who studied the English language in "grade school, in high school, and in college." *Id.* at 33. Ms. Laurezo has visited the United States at least twice and has developed personal relationships with a number of individuals, including a man she now considers her boyfriend and his parents whom she refers to as "Mom" and "Dad." (Doc. 58 at 2-3). Ms. Laurezo was able to achieve this level of intimacy and forge these relationships by communicating entirely in English. (Doc. 50 at 12, 15, 31). In addition, Ms. Laurezo and Dain Adams' relationship continued even after her arrest, where she made 44 separate jail calls and spoke with Dain Adams in English. (Doc. 58 at 13).

Ms. Laurezo's educational history showcases at least a rudimentary understanding of the English language, an understanding that enables her to converse and navigate relationships without significant difficultly. The Court notes that Ms. Laurezo's impressive educational background in airplane mechanics does not necessarily correlate to an ability to understand English. However, her pursuit of an FAA certification, which would require an understanding of technical and advanced English terms, does demonstrate a certain command of the English language.

Next, the Court will turn to *Carrizales-Toledo* factors two through five, which examine the length, nature, and circumstances surrounding the interrogation. At multiple points throughout the July 3, 2018 interview, Ms. Laurezo expressed confusion. For example:

> **Sgt. Perham**: Let me ask you this: Do you understand what we just read you? Do you know what your rights are while you're in this country?
>
> **Ms. Laurezo**: I'm here for a visit and to take exams so –

(Doc. 36-1 at 10).

> **Sgt. Perham**: Either you will talk to us or you won't talk to us. If you don't want to talk to us, then we're done with our interview.
>
> **Ms. Laurezo**: I don't understand this. I – to be honest, I – I feel like I don't know because – yeah. I think – what will be the consequences if I talk to you is again?

*Id.* at 11-12.

> **Det. Valderaz**: So the next question is: Do you want to talk to us, basically? Are you willing to talk to us? You can either mark yes or no. Nobody's going to force you to do anything you don't want to do. Do you understand that?
>
> **Ms. Laurezo**: It's just I don't know.

*Id.* at 14.

In an effort to determine whether Ms. Laurezo understood what he was saying, Detective Valderaz asked her to verbally confirm that she understood on nine different occasions. *See* (Doc. 36-1 at 8-15). Detective Valderaz also repeated six times that Ms. Laurezo did not have to speak to them and she could stop the interview at any time. (Doc. 58 at 15). Further, when asked if she understood "You do not have to say anything at all. Anything you do say can be used against you in a court law," Ms. Laurezo responded, "Yeah." (Doc. 36-1 at 8). When asked if she understood that "Before you talk to us, you have the right to talk to a lawyer. If you cannot pay for a lawyer, the judge will furnish one for you free, if you desire," Ms. Laurezo also responded, "Yeah." *Id.* at 9. In addition, after Sergeant Perham reiterated her right to stop the interview at any time, Ms. Laurezo repeated back to him, "So I can stop any time, even if --." *Id.* at 14.

The interview lasted less than two hours and the tone throughout the interview remained conversational. *See generally* (Doc. 36-1); *see Carrizales-Toledo*, 454 F.3d at 1153 (explaining the Court must consider "the length of [any] detention" and "the length and nature of the questioning"). Ms. Laurezo was advised of her constitutional rights in both written and spoken form and confirmed that she understood those rights on multiple occasions. (Doc. 36-1 at 1-17). Detective Valderaz repeated and rephrased Ms. Laurezo's rights and sought verbal and written confirmation from Ms. Laurezo that she understood them. *Id.*; *see Carrizales-Toledo*, 454 F.3d at 1153 (explaining the Court must consider "whether the defendant was advised of her constitutional rights"). Finally, neither party suggests Ms. Laurezo was subjected to physical punishment. *See id.*

(explaining the final voluntariness consideration for the Court is "whether the defendant was subjected to physical punishment.").

Next, when Detective Valderaz and Sergeant Perham explained Ms. Laurezo's right not to speak with law enforcement because "anything [she] says could be used against her" if "any criminal charges were to be filed," Ms. Laurezo expressed concern about the nature of the interview. (Doc. 36-1 at 9-11). She stated, "[N]ow I'm in doubt because I don't know where this is going to." (Doc. 36-1 at 11). In addition, after Detective Valderaz explained Ms. Laurezo's right to talk with an attorney, Ms. Laurezo asked "why?" *Id.* at 9. Finally, upon being informed that she was being placed under arrest, Ms. Laurezo asked, "So what do I do next? Do I need a lawyer or what?" (Doc. 36-1 at 115).

Ms. Laurezo's concern centered around what the officers wanted to talk to her about, demonstrating her ability to understand the officers' intent to discuss their criminal investigation involving the sexual exploitation of children. This conclusion is supported by Ms. Laurezo's testimony at the suppression hearing and her statements to the Honorable Joel M. Carson at her initial appearance two days later, on July 5, 2018. Indeed, Ms. Laurezo confirmed to Judge Carson that she understood "an attorney is a legal representative who would represent [her] in court." (Gov. Ex. 50 at 3). At the close of her initial appearance, Ms. Laurezo asked Judge Carson, "when can I talk to the lawyer?" *Id.* at 10. These comments, coupled with her statements during the July 3, 2018, interview, indicate that Ms. Laurezo understood what an attorney was and that she was entitled to have one appointed.

17

Next, Ms. Laurezo testified with the aid of an interpreter at the motion to suppress hearing, but she responded to questioning on direct and cross examination almost entirely in English. (Doc. 58 at 12). At the suppression hearing, Ms. Laurezo made a number of comments on both direct and cross examination that showed she sufficiently understood her rights to a degree that she was capable of voluntarily waiving them. Specifically, the following set of exchanges establish that Ms. Laurezo understood her Fifth Amendment rights:

> **Defense Attorney**: Now, did you believe that you were just free to walk out of that building?
>
> **Ms. Laurezo**: No.
>
> **Defense Attorney**: Walk out of the room?
>
> **Ms. Laurezo**: No.
>
> **Defense Attorney**: Why –
>
> **Ms. Laurezo**: When they keep asking me – with those men on the first room, I felt like I'm all alone. I didn't know – I don't know what's happening. I mean, the Sheriff's Office, it's all close. I don't see Dain. I don't see Dad Donnie. I don't see Mom Marsha. I don't – I feel like I'm in a box, like I need to come out. I need to go out. *I need to defend myself*. I need – this is all that – it's just me. That's all I felt at that time.

(Doc. 50 at 44).

> **Defense Attorney**: Now, did you understand what the potential consequences could be for you to talk to [law enforcement]?
>
> **Ms. Laurezo**: No.
>
> **Defense Attorney**: Do you know why you didn't understand that?
>
> **Ms. Laurezo**: I don't know what's happening. I don't know why are they calling – why did they call me. I don't know why those things are happening. Even if they explain it to me, I keep asking – I keep telling them, 'I don't understand.' I feel – I'm just so afraid at that time. As I told

18

you, I'm all alone. I felt like I'm all alone, and I don't know – *I just wanted it to end. I just wanted to go home*. I just – that's all I was thinking at that time.

*Id.* at 46-47.

> **Defense Attorney**: And again, at any point, why did you not just say, "I'm done with the interview. I want to leave?"

> **Ms. Laurezo**: This is my first time that I was in this situation. And in my country, my understanding, *if you are – if the police – or you're in a room and you are talking to a police, it's a sign of disrespect if you stop or if you just leave*. So at that time, I was just waiting for them to just say, "Okay. This is done. This is over."

*Id.* at 47-48.

> **Government**:  [S]o when someone tells you, "you don't have to talk to me," what does that mean?

> **Ms. Laurezo**: That you – I can talk. I cannot.

> **Government**: You can choose not to talk, correct?

> **Ms. Laurezo**: Yeah.

*Id.* at 59-60.

> **Government**: [The officers] are having a conversation with you where they are continually telling you that you don't have to talk to them if you don't want to, correct?

> **Ms. Laurezo**: That's when I asked them if – what will happen if I say no?

> **Government**: And they told you that you wouldn't be in any trouble; isn't that true?

> **Ms. Laurezo**: Yes. They said that I wasn't going to be in trouble. So that means that I'm not going to be in trouble. So –

*Id.* at 61.

These exchanges highlight that Ms. Laurezo did not exercise her *Miranda* rights for a host of reasons, none of which were because she did not understand that she

possessed those rights. Indeed, Ms. Laurezo's testimony indicates that she understood her rights but chose not to exercise them because she thought doing so would be disrespectful to Detective Valderaz and Sergeant Perham, she wanted to defend herself, and she wanted the interview to end so she could go home. *See id.* at 44-48. Notably, although Ms. Laurezo testified that not answering law enforcement's questions would have been disrespectful, she later refused to give her phone password when asked by Detective Valderaz. (Doc. 36-1 at 63).

Finally, the Court would be remiss if it did not mention that Ms. Laurezo stated on at least two occasions that she was familiar with the English language. First, in the beginning of the July 3, 2018, interview Ms. Laurezo told the officers, "now I can say I'm really confident talking English." (Doc. 36 at 23). Then, at her initial appearance in front of Judge Carson, Ms. Laurezo was asked if she was "comfortable communicating with [the Judge] in English," and she responded, "Yes sir. I will just say if it's too fast." (Gov. Ex. 50 at 7). Following this statement, Ms. Laurezo never indicated to Judge Carson that he was speaking too fast. *Id.* Instead, she confirmed to Judge Carson that she was able to "read and write English." *Id.*

The Court is sympathetic to the fact that Ms. Laurezo does not have a mastery command of the English language. Further, it is understandable that an individual's English comprehension may vary when faced with unfamiliar circumstances, stress, or social pressure. The Court also recognizes that cultural differences make already difficult interactions with law enforcement officers even more daunting to navigate. However, the weight of the evidence supports a finding that Ms. Laurezo knowingly, intelligently, and voluntarily waived her Fifth Amendment rights. Indeed, as set forth

above, the limited length of detention and the conversational nature of the questioning –

coupled with Ms. Laurezo's age, intelligence, and education – support this conclusion.

Moreover, Ms. Laurezo's testimony at the evidentiary hearing, her repeated use and

confirmed understanding of English, and the great lengths Detective Valderaz went to

ensure that Ms. Laurezo understood her rights, all support a finding that she knowingly,

intelligently, and voluntarily waived her Fifth Amendment rights. Therefore, the Court

recommends that Ms. Laurezo's motion to suppress be denied.

### IV.    Recommended Disposition

In sum, the Court finds that Ms. Laurezo was subject to a custodial interrogation

on July 3, 2018. As such, Ms. Laurezo was entitled to the protection of the Fifth

Amendment. The Court further finds that Ms. Laurezo knowingly, intelligently, and

voluntarily waived her Fifth Amendment rights. For the reasons stated above, the Court

**RECOMMENDS** that Defendant Jade Tiffany Laurezo's *Motion to Suppress*

*Statements*, (Doc. 27), be **DENIED**.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a
copy of these Proposed Findings and Recommended Disposition they may file written
objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party
must file any objections with the Clerk of the District Court within the fourteen-
day period if that party wants to have appellate review of the proposed findings
and recommended disposition. If no objections are filed, no appellate review will
be allowed.**

_____
THE HONORABLE CARMEN E. GARZA
CHIEF UNITED STATES MAGISTRATE JUDGE