## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                            CR 18-3413 KG

JADE TIFFANY LAUREZO,

      Defendant.

## ORDER ADOPTING CHIEF MAGISTRATE JUDGE'S
## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court on Chief Magistrate Judge Carmen E. Garza's *Proposed Findings and Recommended Disposition* (the "PFRD"), (Doc. 69), filed May 2, 2019; Defendant Jade Tiffany Laurezo's *Objections to the Proposed Findings and Recommended Disposition Regarding Motion to Suppress Statements*, (Doc. 73), filed May 16, 2019; the Government's *Objections to Proposed Findings and Recommended Disposition Regarding Defendant's Motion to Suppress Statements*, (Doc. 72), filed May 16, 2019; Ms. Laurezo's *Response to Government's Objections*, (Doc. 80), filed May 31, 2019; and the Government's *Response to Defendant's Objections*, (Doc. 78), filed May 31, 2019. In the PFRD, the Chief Magistrate Judge recommended that Ms. Laurezo's *Motion to Suppress Statements*, (Doc. 27), be denied. (Doc. 69 at 21).

The parties were informed that objections to the Chief Magistrate Judge's opinion were due within fourteen days of service of the PFRD in accordance with 28 U.S.C. § 636(b)(1)(C). *Id.* Ms. Laurezo and the Government both timely objected to the PFRD on May 16, 2019. (Doc. 72); (Doc. 73). In addition, both parties filed Responses on May 31, 2019. (Doc. 78); (Doc. 80). Following a *de novo* review of the *Motion to Suppress*

*Statements*, PFRD, the Objections, and the Responses, the Court will overrule the Objections, adopt the PFRD, and deny the *Motion to Suppress Statements*.

## I.    Background

Defendant Jade Tiffany Laurezo is a native of the Philippines and was visiting the United States to complete a Federal Aviation Administration licensure exam. (Doc. 73 at 1); (Doc. 50 at 53). The facts of this case are fully set forth in Chief Magistrate Judge Garza's PFRD, detailing Ms. Laurezo's history in the United States, English language abilities, and the investigation that led to her arrest. (Doc. 69 at 1-7). The following is a brief recitation of the pertinent facts before the Court.

On the morning of June 27, 2018, approximately eight law enforcement officers arrived at 3809 Zinnia Road in Roswell, New Mexico and executed a search warrant in connection with suspected possession of child pornography. (Doc. 51 at 25). The officers approached the home with their firearms positioned in the "low ready" position, and commanded Ms. Laurezo and the other occupants of the home to exit through the front door. *Id.* at 54. In compliance with the search warrant, law enforcement officers seized a number of electronic devices from the 3809 Zinnia Road residence, including Ms. Laurezo's Samsung DUOS cellphone. *Id.* at 32.

On the afternoon of July 3, 2018, Sergeant Hector Ramirez and Deputy Will Seely arrived at the 3809 Zinnia Road residence and inquired if Ms. Laurezo would be willing to visit the Chaves County Sheriff's Department for an interview. (Doc. 51 at 70-75). After Ms. Laurezo agreed to undergo an interview and opted to drive separately, Deputy Seely and Sergeant Ramirez waited outside in their patrol units for roughly fifteen minutes until Ms. Laurezo left the home. *Id.* at 75. At first, Sergeant Ramirez and

Deputy Seely both followed Ms. Laurezo en route to the Sheriff's Department, but as the driver began to take an intentionally indirect route, Deputy Seely stopped following the vehicle. *Id.* Sergeant Ramirez followed Ms. Laurezo and the driver, Donald Roberson, until their arrival at the Sheriff's Department. *Id.*

Upon arriving at the Sheriff's Department, Ms. Laurezo was first interviewed by immigration officials to inquire about the effects of an arrest on her visa status. (Doc. 51 at 86-87). After her interview with immigration officials, Ms. Laurezo was escorted to a second interview room where she was met by Detective Raul Valderaz and Sergeant Doug Perham. (Doc. 36-1 at 1-8). Ms. Laurezo initially struggled to understand the Advice of Rights form presented to her by Detective Valderaz, but she eventually signed the form and agreed to be interviewed regarding the officers' investigation of sexual exploitation of a child. *Id.* at 8-16. At the end of the interview, Ms. Laurezo was placed under arrest for possession of child pornography. *Id.* at 114. Ms. Laurezo now moves to suppress her statements made to Detective Valderaz and Sergeant Perham during her July 3, 2018 interview. (Doc. 27).

In the PFRD, the Chief Magistrate Judge found that Ms. Laurezo was in custody during her July 3, 2018 interview with law enforcement but she voluntarily waived her Fifth Amendment rights. (Doc. 69 at 21). As such, the Chief Magistrate Judge recommended that Ms. Laurezo's *Motion to Suppress Statements* be denied. *Id.* The Government has objected to the PFRD's conclusion that Ms. Laurezo was in custody during her interview and contends instead that she was free to terminate the interview and leave at any time. (Doc. 72 at 2-16). Ms. Laurezo makes no objection to the Chief Magistrate Judge's conclusion that she was in custody but instead argues she did not

knowingly and voluntarily waive her Fifth Amendment rights. (Doc. 73 at 4-14). In addition, Ms. Laurezo alleges that because she was in custody during the July 3, 2018 interview, the statements she made before she was read her *Miranda* rights must be suppressed. The Court will address each argument in turn, beginning with the factual objections presented by both parties.

## II.    Analysis

When resolving objections to a magistrate judge's recommendation, the district judge must make a *de novo* determination regarding any part of the recommendation to which a party has properly objected. 28 U.S.C. § 636(b)(1)(C). Filing objections that address the primary issues in the case "advances the interests that underlie the Magistrate's Act, including judicial efficiency." *United States v. One Parcel of Real Prop., With Bldgs., Appurtenances, Improvements, & Contents*, 73 F.3d 1057, 1059 (10th Cir. 1996). Objections must be timely and specific to preserve an issue for *de novo* review by the district court or for appellate review. *Id.* at 1060. Additionally, issues "raised for the first time in objections to the magistrate judge's recommendation are deemed waived." *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996); *see also United States v. Garfinkle*, 261 F.3d 1030, 1031 (10th Cir. 2001).

### A.    Factual Objections

First, Ms. Laurezo has objected to the following factual findings presented in the PFRD: (1) Ms. Laurezo was in the United States "stud[ying] in pursuit of a Federal Aviation Administration certificate to train aircraft maintenance personnel for U.S. based customers," (Doc. 73 at 1); (2) after the search warrant was executed on June 27, 2018, "the occupants [of the home] were permitted to return inside," *id.* at 2; (3) "Ms. Laurezo

agreed to speak with law enforcement at the sheriff's department," *id.*; (4) "Although she was offered a ride by Deputy Seely, Ms. Laurezo chose to drive separately with Donnie Roberson," *id.*; and (5) "She ultimately decided to forego a visit to her neighbor's home and instead proceeded directly to the Sheriff's Department," *id.*

Ms. Laurezo contends the above facts "misrepresent[]" the "posture of Ms. Laurezo['s case]" or are not otherwise supported by the record. *Id.* Ms. Laurezo clarifies that she "reluctantly went to the Sheriff's office because she had no choice" and she "did not voluntarily forego a visit to the neighbor's home[,] [s]he did not go because she was being followed." *Id.* The Court finds that even if each of these facts were modified to represent Ms. Laurezo's framing of the case, the outcome and analysis would remain unchanged. For example, whether Ms. Laurezo was in the United States to simply study or to take an exam has no bearing on the Court's conclusion that her English proficiency is sufficient to voluntarily waive her Fifth Amendment rights. As such, the Court will overrule Ms. Laurezo's factual objections.

The Government similarly seeks to reframe factual assertions presented in the PFRD to support its position. For example, it disputes how the PFRD "characterized" the interaction between law enforcement and Ms. Laurezo on July 3, 2018, (Doc. 72 at 7), and contends the Chief Magistrate Judge "omitted" certain facts from her analysis, (Doc. 72 at 8). The PFRD and hearing transcripts reflect that the Chief Magistrate Judge viewed video evidence, heard testimony from witnesses, and read transcribed statements presented by the Government during the hearing, pertaining specifically to the interactions between law enforcement officials and Ms. Laurezo on July 3, 2018. *See, e.g.*, (Doc. 69 at 1-21). Thus, even if the Court were to modify the PFRD to reflect

the more favorable language proposed by the Government, the conclusion and analysis in this case demonstrate a thorough review of the record and would remain unchanged.

Notably, the Government highlights two facts derived from Ms. Laurezo's *Findings of Fact and Conclusions of Law*, (Doc. 56), that were presented in the PFRD which it contends are incorrect. First, the Government argues there is no proof that Deputy Seely pointed his firearm at Ms. Laurezo during the execution of the search warrant on June 27, 2018. (Doc. 72 at 7). The Court agrees there is no direct evidence illustrating that Deputy Seely pointed his firearm at Ms. Laurezo. However, the lapel camera footage reveals that Deputy Seely's firearm was drawn when he approached the 3809 Zinnia Road residence and it remained in the "low ready position," pointed at the home and its occupants, until everyone inside the home had exited. *See* (Doc. 80 at 3). Thus, Ms. Laurezo's statement that Deputy Seely "was one of the deputies that had pointed a gun [at her] when the search warrant was executed," is a reasonable inference. *See* (Doc. 56 at 2). The Court will therefore overrule the Government's objection.

Next, the Government notes the officers were not in uniform when they questioned Ms. Laurezo. (Doc. 72 at 5, note 3). The Court agrees that all of the law enforcement officers who interviewed Ms. Laurezo were in civilian clothing on July 3, 2018.[1] *See* (Doc. 51 at 91); (Gov. Ex. 49); *see contra* (Doc. 80 at 4) (Ms. Laurezo's

---

1.      For purposes of clarity, the Court notes that Officer Segovia, Officer Subia, Detective Valderaz, and Sergeant Perham were in civilian clothing on July 3, 2018 when they interviewed Ms. Laurezo. However, Sergeant Hector Ramirez and Deputy Will Seely were in uniform on July 3, 2018 when they went to 3809 Zinnia Road and asked if Ms. Laurezo would submit to questioning. In addition, the eight law enforcement officers who executed the search warrant on June 27, 2018 were each in uniform during the search, including Detective Valderaz.

Response) ("[T]hree uniformed men were waiting for her in the initial interview room."). The Court is mindful that the Tenth Circuit will "accept the district court's factual findings" and seeks to preserve the most accurate record for any future proceedings. *See United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008) (citations omitted). Therefore, for purposes of keeping an accurate record, the Court will modify the Chief Magistrate Judge's PFRD to reflect that the officers and immigration officials who interviewed Ms. Laurezo were not in uniform on July 3, 2018. In all other respects, the PFRD's factual recitation of this case remains unaltered.

   B.  *Custodial Analysis*

   The Government first argues the PFRD "emphasized the subjective mindset of [Ms.] Laurezo and the officers, both of which are not relevant to the custody analysis." (Doc. 72 at 3). Specifically, the Government contests the relevance of two facts set forth in the PFRD: (1) the police officers' previously formed intent to "charge [Ms. Laurezo] with a crime," even before she arrived at the police station; and (2) Ms. Laurezo's confusion regarding the "distinction between the immigration officials and detectives." (Doc. 72 at 3-5). The Government argues these "subjective" facts are "not relevant to the [custodial] analysis." (Doc. 72 at 3).

   In the PFRD, the Chief Magistrate Judge explained that in accordance with United States Supreme Court precedent, she first "identif[ied] the relevant circumstances surrounding Ms. Laurezo's interrogation." (Doc. 69 at 8) (citing *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011)). Indeed, the Supreme Court has emphasized that "rather than demarcate a limited set of relevant circumstances, we have required police officers and courts to examine all of the circumstances surrounding the

7

interrogation, including any circumstance that would have affected how a reasonable person in the suspect's position would perceive his or her freedom to leave." *J.D.B.*, 564 U.S. at 270-71 (internal citations omitted). This inherently requires a court to "reconstruct[] the scene" and set forth the "players' lines and actions" before applying the objective test to resolve the issue of whether the defendant was in custody. *Id.* at 270; *see also United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) ("The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive.") (citing *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993)).

The Chief Magistrate Judge did exactly that. First, the PFRD sets forth nearly three pages of "relevant circumstances surrounding [the] interrogation." (Doc. 69 at 8). Then, the Chief Magistrate Judge stated, "[i]n light of the circumstances described above, an individual in Ms. Laurezo's position would not have felt she was at liberty to terminate the interrogation." (Doc. 69 at 10). The PFRD continued to apply the "circumstances" of the interrogation to a "reasonable person" or "objective" standard:

> Indeed, based on law enforcement's behavior in ensuring Ms. Laurezo's arrival at the Sheriff's Department, the average person likely would not have believed they had the liberty to decline the invitation to come in for questioning. In addition, an individual in Ms. Laurezo's position would have likely felt outnumbered and intimidated when being questioned by three male immigration officials, one of whom stood throughout the duration of the interview, as they asked prying and intimate questions. A reasonable person may not be able to discern the role of different [] officers for purposes of distinguishing them as immigration officials or detectives. A person in Ms. Laurezo's position may have lacked an understanding of the different purposes each interview sought to achieve and may have perceived both interviews as being conducted by police officers for investigative purposes.

(Doc. 69 at 11). The Chief Magistrate Judge's analysis complies with the framework mandated by the United States Supreme Court.

The Government is correct that the subjective intent of Ms. Laurezo and law enforcement officials is not relevant to the objective analysis the Court must undertake. *See* (Doc. 72 at 3-4) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 422 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time[.]")). However, a review of the PFRD reveals that while the Chief Magistrate Judge included subjective criteria in her factual recitation of the circumstances relevant to this case, she did not utilize those subjective beliefs in her ultimate objective analysis. *See, e.g.*, (Doc. 69 at 12) ("In sum, the facts of this case illustrate that an individual in Ms. Laurezo's position likely would not feel that they had the liberty to refuse to accompany law enforcement to the Sheriff's Department nor, once they arrived, the liberty to leave."); *see also Griffin*, 7 F.3d at 1519 (explaining that "[t]he second police officer knew defendant was a suspect in a drug crime," before concluding that the defendant was in custody).

Next, the Government argues that pursuant to the undisputed "objective" facts presented in this case, the Court should determine that Ms. Laurezo was not in custody. (Doc. 72 at 5) ("Applying the reasonable person standard without considering [Ms.] Laurezo or the officers' subjective perceptions or intentions, this Court should find that [Ms.] Laurezo was not in custody."). In crafting this argument, the Government relies on, *inter alia*, the Tenth Circuit's opinion in *Jones*, 523 F.3d at 1235. *See* (Doc. 72 at 13-14). In *Jones*, two unmarked police cars followed the defendant from the courthouse to a gas station "at the intersection of two major streets." *Jones*, 523 F.3d at 1237. The

agents situated themselves in a "public area with people coming back and forth" and waited for the defendant to exit the gas station convenience store. *Id.* When the defendant walked out, one officer said, "I'm a federal agent. Can I talk to you?" *Id.* The defendant consented to speaking with the agent in his unmarked patrol car parked outside of the convenience store. *Id.* The court in *Jones* found that although the defendant was interviewed inside an unmarked patrol car with four officers present, she was not in custody for purposes of the Fifth Amendment. *Id.*

This case is distinguishable from *Jones* on several critical points. First, the defendant in *Jones* did not know "the agents had followed her from the courthouse all the way to the gas station." *Id.* at 1243. Second, although there were multiple officers present, only one officer ever spoke to the defendant throughout the interview. *Id.* at 1242. Third, the officer's car "lacked virtually any official indicia that might normally intimidate a person placed into a fully equipped police vehicle." *Id.* at 1243. Finally, the defendant in *Jones* was questioned in a public area with "people going back and forth." *Id.*

Here, at least one, but at times two, marked police cars waited for and then followed Ms. Laurezo from the home where she was staying to the Sheriff's Department. *See* (Doc. 51 at 75-76). Once inside the Sheriff's Department, Ms. Laurezo was questioned by at least four law enforcement officials – Officer Segovia, Officer Subia, Detective Valderaz, and Sergeant Perham. (Doc. 51 at 88); (Doc. 36-1 at 2-3). Next, Ms. Laurezo was not in a public area and had no ability to view the public outside of the interview room where she was questioned. (Gov. Ex. 42-46). In addition, while the

environment in *Jones* "lacked virtually any official indicia" of a police presence, the interview here took place in an interrogation room inside the Sheriff's Department. *Id.*

Perhaps most notably, however, the defendant in *Jones* "freely left in her own car" at the end of the interview. *Jones*, 523 F.3d at 1243. The Tenth Circuit opined this was "a fact we found telling in *Chee*, where the suspect freely left after police-station interrogation." *Id.* at 1243-44 (citing *2 Criminal Procedure § 6.6(c)*, "the Supreme Court and the lower courts have relied upon the fact that the suspect was allowed to leave following the interrogation as strong evidence that the interrogation was not custodial."). In *Chee*, and *Mathiason*, a United States Supreme Court case that *Chee* relies upon, the defendant left at the end of the interrogation. *United States v. Chee*, 514 F.3d 1106, 1111 (10th Cir. 2008); *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977) ("[the defendant] was released to go about his job and return to his family"). In contrast, after the interview in this case, Ms. Laurezo was placed under arrest. (Doc. 36-1 at 114).

The Government specifically combats these facts by highlighting four circumstances which it argues weigh in favor of finding Ms. Laurezo was not in custody: (1) "[Ms.] Laurezo freely and voluntarily decided to travel to the Sheriff's Department for an interview," (Doc. 72 at 6); (2) "[Ms.] Laurezo was repeatedly informed she did not have to talk to the officers and could terminate the encounter," *id.* at 9-10; (3) "the nature of the questioning matched the nature of the investigation and also focused on another individual," *id.* at 10-13; (4) "[Ms.] Laurezo was engaged by only two officers at a time, none of the officers came into physical contact with her or made a display of force, and each used a conversational tone when speaking to her," *id.* at 13-16. While each of these facts are true, they contribute to the myriad of circumstances surrounding

Ms. Laurezo's encounter with law enforcement and do not detract from the overall conclusion that "under the totality of the circumstances" the facts of this case "add up to custody." *See* (Doc. 69 at 11).

Indeed, the facts here highlight that, unlike the defendant in *Jones*, Ms. Laurezo was subject to an interview conducted in a "police dominated atmosphere." *See Chee*, 514 F.3d at 1113. The Tenth Circuit Court of Appeals has explained that "[w]here police are in full control of the questioning environment, custody is more easily found." *Griffin*, 7 F.3d at 1518. Specifically, in finding whether the defendant was in custody, the court may consider, among other circumstances, "whether the suspect was separated from his family and isolated in a nonpublic questioning room, whether there was the threatening presence of several officers, whether there was any display of weapons or physical contact with the suspect, and whether the officer's language and tone indicated that compliance might be compelled." *Id.* This "atmosphere" of police domination was a significant consideration in the Tenth Circuit's decisions in *Jones*, *Chee*, and *Griffin. See Jones*, 523 F.3d at 1242 (explaining that a "lack of police domination" rendered the interview less likely to be custodial); *Chee*, 514 F.3d at 1113 ("[W]e analyze whether the environment was police dominated."); *Griffin*, 7 F.3d at 1518 ("A final factor commonly examined is the circumstances showing a 'police dominated' atmosphere") (internal citation omitted).

Here, Ms. Laurezo was not in control of the environment. When she arrived at the Sheriff's Department, Ms. Laurezo saw Marsha Roberson, a woman she refers to as "Mom," but was not able to speak with her. (Doc. 50 at 40) ("[T]he sheriff told me just get inside the office. So I wasn't able to talk to Mom."). In addition, Ms. Laurezo knew

"Dad," Donnie Roberson, and her boyfriend, Dain Adams, were present somewhere in the Sheriff's Department but she was not able to consult with either of them after she was directed to a secure area of the station. *Id.* at 44; (Doc. 51 at 98) (confirming that the interview room was "a secure part of the Sheriff's Department"). Ms. Laurezo was then separated from the public, isolated in a private room, and questioned by several individuals who identified themselves as law enforcement officers over the course of more than one interview. *See* (Gov. Ex. 42-46); (Doc. 36-1).

Furthermore, Ms. Laurezo does not have a mastery command of the English language, was likely intimidated by the presence of four officials interviewing or observing her at various times, and was escorted not only to the Sheriff's Department but also between interview rooms and to the restroom by law enforcement officers. *See* (Doc. 69 at 9-10). Less than one week before her interview, eight officers arrived at the home where she was staying in uniform and ordered Ms. Laurezo out of the house, displaying weapons. *See* (Doc. 51 at 53-54). On the day of the interview, Ms. Laurezo recognized at least one of these officers when he arrived at her home in uniform to ask if she would submit to questioning at the Sheriff's Department. (Doc. 50 at 37). While there was no show of force on the day of Ms. Laurezo's interview, the temporal connection is not so attenuated that she would have forgotten her encounter with law enforcement officials merely six days earlier.

Notably, police domination is not the only factor that a court may consider in determining whether an individual is in custody. *See Griffin*, 7 F.3d at 1518. Indeed, courts also look to "[w]hether the suspect was aware that she was free to refrain from answering questions" and the "[n]ature of the questioning." *Id.* Here, the nature of the

questioning and Ms. Laurezo's understanding of her ability to refrain from answering questions is clouded by her difficultly conversing in English and her unfamiliarity with the American criminal justice system. *See, e.g.*, (Doc. 50 at 34) (Ms. Laurezo claims to have "No, nothing, ma'am, zero" familiarity with the American criminal justice system).

In sum, the circumstances surrounding the interview and the nearly constant law enforcement surveillance from the home where she was staying to the Sherriff's Department bathroom, would not lead a reasonable person in Ms. Laurezo's position to think the interaction with law enforcement was voluntary. For all of these reasons, and those more thoroughly discussed in the PFRD, the Court agrees that Ms. Laurezo was in custody during her July 3, 2018 interview and will therefore overrule the Government's objections.

C. *Statements Made Prior to Waiver of Miranda*

Ms. Laurezo next argues that in light of the Court's holding that she was in custody during the July 3, 2018 interview, any statements made to law enforcement before she was read her *Miranda* rights must be suppressed. (Doc. 73 at 2-4). In response, the Government contends Ms. Laurezo waived any challenge to the statements she made to immigration officials by never addressing such an argument in her initial motion nor in her objections. (Doc. 78 at 1, note 1). The Court agrees that any argument regarding Ms. Laurezo's statements made to immigration officials is waived. *See Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) (Issues "raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

However, the Court understands Ms. Laurezo to be arguing for suppression of her statements made to Detective Valderaz and Sergeant Perham during her July 3,

2018 interview before she was read her *Miranda* warnings. (Doc. 73 at 2-3). Ms. Laurezo contends her statements contain potentially inculpatory information, such as "her name and date of birth," where she was residing in the United States, her relationship with Dain Adams, and her cellphone number. (Doc. 73 at 3). In response, the Government argues this background information is merely "biographical" and is therefore not subject to suppression. (Doc. 78 at 3).

When a suspect is determined to be in custody, law enforcement officers must administer *Miranda* warnings to "safeguard the constitutional guarantee against self-incrimination." *J.D.B.*, 564 U.S. at 269. Indeed, *Miranda* was adopted to serve as a prophylactic measure to protect individuals from the coercive police pressure that is inherent with custodial interrogations. *Stansbury v. California*, 511 U.S. 318, 322 (1994). When police elicit statements from a suspect without first complying with *Miranda*, the statements may not be admitted for certain purposes at the suspect's trial. *Id.*

However, law enforcement may ask a suspect to identify himself without providing a *Miranda* warning. *United States v. Lara-Garcia*, 478 F.3d 1231, 1235, n. 3 (10th Cir. 2007) (internal citations omitted). Specifically, "the disclosure of name and address is essentially a neutral act," and is therefore not considered to be "testimonial" for purposes of the Fifth Amendment. *Id.* In addition, "questions as to date and place of birth are normal questions attendant to arrest and custody and do not require a *Miranda* warning." *Id.* This remains the case "even if identification of the person may help lead to the prosecution of that person for a crime." *Id.*

Law enforcement may not hide behind this "routine booking exception," however, if the questions asked are "reasonably likely to elicit incriminating information relevant to

establishing an essential element necessary for a conviction […]." *United States v. Parra*, 2 F.3d 1058, 1068 (10th Cir. 1993). Indeed, "where questions regarding normally routine biographical information are designed to elicit incriminating information, the questioning constitutes interrogation subject to the strictures of *Miranda*." *Id.* (internal citations omitted). Therefore, when determining whether a biographical question is admissible absent a *Miranda* waiver, the Court must ascertain whether the question was reasonably likely to elicit incriminating information. *Id.*

Before reading her the *Miranda* waiver, Detective Valderaz asked Ms. Laurezo her full name, date of birth, how long she had been in the United States, cellphone number, where she was staying, and if Dain Adams was her boyfriend. (Doc. 36-1a at 1-7). The Court finds that Detective Valderaz' questions and the corresponding answers regarding Ms. Laurezo's age, date of birth, full name, and her English proficiency are each admissible as routine booking questions. (Doc. 36-1 at 1-4). The Court does not find, and Ms. Laurezo does not direct the Court to any evidence that Detective Valderaz asked if she understood English for an underhanded purpose, such as to incriminate her or to establish an essential element necessary for conviction. Thus, absent any argument or evidence to the contrary, the Court finds these statements are the result of routine biographical questions, attendant to arrest and custody.

However, Detective Valderaz' questions regarding Ms. Laurezo's cellphone number, time spent in the United States, current address, and relationship with Dain Adams were reasonably likely to elicit incriminating information. Specifically, before the interview began, Detective Valderaz knew that Ms. Laurezo's cellphone contained direct evidence of child pornography. (Doc. 36-1 at 76) (In speaking with Ms. Laurezo,

Detective Valderaz explained, "you're in trouble because of what you have on this phone."). Therefore, admitting her cellphone number, and thus ownership of the cellphone, is undoubtedly incriminating when the cellphone contains evidence of the crime being investigated. *See, e.g.*, *United States v. Medrano*, 356 Fed.Appx. 102, 107 (10th Cir. 2009) (unpublished) ("When an agent asks a defendant about his true name for the direct and admitted purpose of linking the defendant to his incriminating immigration file, he violates that defendant's *Miranda* rights.") (quoting *Parra*, 2 F.3d at 1068).

In addition, asking Ms. Laurezo about her previous travels in the United States and her current residence in Roswell, New Mexico was reasonably likely to elicit incriminating information. Indeed, in questioning Ms. Laurezo about whether she downloaded child pornography, Detective Valdreaz used her prior pre-*Miranda* statement, that she had been in Roswell, New Mexico since March, against her: "You've already told us that you've been here since March." (Doc. 36-1 at 106). Her statement before she waived her *Miranda* rights therefore later incriminated her when it tied her to the date and location where evidence of child pornography was downloaded. It is therefore evident that this information established an essential temporal and locational link for a conviction of possession of child pornography.

Finally, asking Ms. Laurezo her relationship with Dain Adams was likely to elicit an incriminating response. Most notably, as soon as Ms. Laurezo relinquished her *Miranda* rights, the officers immediately began questioning her in more detail about her relationship with Dain Adams. (Doc. 36-1 at 16) (the first question Detective Valderaz asked was, "[h]ow did you meet [*sic*] Dane?"). In this case, it is unclear how Ms.

Laurezo's relationship with her co-defendant, Dain Adams, could be construed as "normally routine biographical information." As such, the Court finds that Ms. Laurezo's statements regarding her cellphone number, arrival to the United States, residence, and relationship with Dain Adams are inadmissible because she had not yet waived her *Miranda* rights.

In sum, the Court finds that Ms. Laurezo's pre-*Miranda* answers revealing her age, date of birth, full name, and English proficiency were not used for purposes of interrogation and are therefore admissible. (Doc. 36-1 at 1-4). The Court further finds that Ms. Laurezo's statements regarding her relationship to Dain Adams, time and residence in the United States, and her cellphone number are suppressed because they were used for purposes of linking Ms. Laurezo to incriminating information. As such, Ms. Laurezo's statements beginning at page 4, line 2, (Doc. 36-1), and ending at page 7, line 21, (Doc. 36-1), are hereby suppressed.

### D. *Voluntary Waiver of Miranda*

Next, Ms. Laurezo argues the Chief Magistrate Judge incorrectly concluded that she voluntarily waived her Fifth Amendment rights. (Doc. 73 at 4-14). Specifically, Ms. Laurezo "objects to the Magistrate Judge's conclusion that her grasp of English and her level of comprehension was sufficient for her to waive her rights." *Id.* at 5. Throughout her Objections, Ms. Laurezo highlights facts cited in the PFRD which she claims support a conclusion contrary to the Chief Magistrate Judge's recommendation. *Id.* at 7 ("Despite a contrary Recommendation, the Magistrate Judge's own findings support that Ms. Laurezo's waiver of rights was not made with full awareness of the nature of the right being abandoned and the consequences of such a decision."). Ultimately, Ms.

Laurezo asks this Court to conclude that the waiver of her *Miranda* rights was not constitutionally sufficient and her statements must therefore be suppressed. *Id.* at 14.

In the PFRD, the Chief Magistrate Judge analyzed Ms. Laurezo's interview under the five-factor test articulated by the Tenth Circuit in *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1153 (10th Cir. 2006). (Doc. 69 at 14). First, the PFRD detailed Ms. Laurezo's "age, education, and intelligence," *id.* at 14-15, and then it analyzed the "length, nature, and circumstances surrounding the interrogation," *id.* at 15-20. Next, the Chief Magistrate Judge walked through Ms. Laurezo's statements during her July 3, 2018 interview and highlighted pertinent sections that supported her conclusion. *Id.* at 18-19. Most notably, the Chief Magistrate Judge explained that Detective Valderaz asked Ms. Laurezo to verbally confirm that she understood on nine different occasions in the interview. *Id.* at 16 (citing Doc. 36-1 at 8-15).

The Chief Magistrate Judge further noted that while "Ms. Laurezo testified with the aid of an interpreter at the motion to suppress hearing," "she responded to questioning on direct and cross examination almost entirely in English." (Doc. 69 at 18) (citing Doc. 58 at 12). After reviewing the transcripts and Ms. Laurezo's testimony, the Chief Magistrate Judge concluded that "Ms. Laurezo did not exercise her Miranda rights for a host of reasons, none of which were because she did not understand that she possessed those rights." (Doc. 69 at 19-20). The Chief Magistrate Judge then explained that Ms. Laurezo's English comprehension was sufficient to support a finding that she voluntarily, knowingly, and intelligently waived her *Miranda* rights. *Id.* at 21.

The determination of whether a defendant understood his *Miranda* rights is a factual one, underlying the legal question of whether the waiver was made voluntarily,

knowingly, and intelligently. *Valdez v. Ward*, 219 F.3d 1222, 1231 (10th Cir. 2000).

When faced with a challenge similar to that presented here, courts often first begin by

determining the defendant's ability to understand and speak English. *See, e.g.*, *United*

*States v. Benally*, 350 F.Supp.3d 1183, 1191-95 (D.N.M. 2018). After making this

determination, if the defendant is found to have an adequate understanding of English,

the court then analyzes whether in light of that understanding, the waiver was made

voluntarily, knowingly, and intelligently. *Id.* at 1195-96. Here, Ms. Laurezo's argument

hinges on the second inquiry - whether her limited English skills and narrow

understanding of American jurisprudence rendered her *Miranda* waiver unconstitutional.

(Doc. 73 at 5) ("[I]t is not disputed that Ms. Laurezo speaks English"). This argument

incorporates her sentiment that "her cultural background, demanding deference to

police figures, made it impossible for her to make a free and deliberate choice to waive

her rights." *Id.* at 9.

  The Tenth Circuit does not require that a defendant possess complete English

fluency in order to voluntarily waive his *Miranda* rights. *See, e.g.*, *United States v. Lugo*,

170 F.3d 996, 1004 (10th Cir. 1999) (finding that although the defendant's first language

was Spanish and he possessed only a ninth-grade education from Mexico, his

responses to police questioning "demonstrated sufficient understanding of the English

language for purposes of interrogation"); *see also Benally*, 350 F.Supp.3d at 1191 ("The

Tenth Circuit has repeatedly affirmed district court findings that a defendant sufficiently

understood *Miranda* warnings in English when the record shows that the defendant

responded appropriately to officers in English.") (collecting cases). Similarly, in following

the guidance proffered by the Tenth Circuit, other United States District Courts have

concluded that a defendant must demonstrate comprehension of the language used in the waiver and at least conversational English proficiency to voluntarily forego his *Miranda* rights. *See, e.g.*, *Benally*, 350 F.Supp.3d at 1192-93 (finding that the defendant understood sufficient English to comprehend his *Miranda* rights where he "answered questions from the agents without difficultly in English" and "displayed adequate conversational skills and comprehension in English"); *United States v. Garcia-Escalera*, 998 F.Supp.2d 1191, 1203 (N.D. Okla. 2014) (concluding that although the defendant's English was "a little choppy" and "he spoke with a heavy accent," testimony that he regularly conversed in English was sufficient to demonstrate that he understood the *Miranda* waiver); *United States v. Ramirez Castillo*, No. 02-40054-01, 2002 WL 1808811, at *3 (D. Kan. July 23, 2011) (unpublished) (concluding that the defendant's interview with law enforcement was sufficient evidence that he voluntarily waived his *Miranda* warnings after considering "what effort the officer made to communicate, whether the defendant responded that he understood his rights or ever indicated that he did not understand them, and what the defendant displayed in English language skills").

In making a determination of voluntariness in light of language barriers, a court may examine a defendant's assurances that he understands his *Miranda* rights and the objective evidence displayed regarding his English comprehension skills. *See, e.g.*, *Valdez v. Ward*, 219 F.3d 1222, 1231 (10th Cir. 2000) (affirming the district court's holding that the defendant voluntarily waived his *Miranda* warnings because he made multiple "assurances over the course of the evening that he understood his *Miranda* rights" and he possessed an "objectively verifiable ability to understand and answer the questions posed to him during the [] interrogation"); *United States v. Sanchez-Chaparro*,

392 Fed.Appx. 639, 644 (10th Cir. 2010) (unpublished) (finding no error in the district court's decision that the defendant understood enough English to waive *Miranda* warnings when the defendant responded appropriately to questioning and conversed with officers in English); *United States v. Zuhrieh*, 124 F.Supp.3d 1187, 1193 (D.N.M. 2015) (noting that "during the hearing held on [the] Motion, Defendant on several occasions responded in English to questions posed by the Prosecution, circumventing his interpreter and demonstrating that he is, evidently, more comfortable in English than Arabic"). Indeed, "Tenth Circuit law does not require an extensive vocabulary, complex sentence structure, or fluency in English for *Miranda* warnings to be valid." *Benally*, 350 F.Supp. at 1193.

Here, the Chief Magistrate Judge thoroughly discussed Ms. Laurezo's background with English, including the personal and intimate relationships she developed speaking entirely in English, the technical certification she came to the United States to achieve, and her repeated use of English at the hearing and during other proceedings. (Doc. 69 at 14-16). In her Objections, Ms. Laurezo contends "the very facts the Magistrate Judge relied upon in determining that Ms. Laurezo was in custody" also demonstrate that she did not voluntarily waive her Miranda rights. (Doc. 73 at 8-9); *see also id.* at 8 ("The Magistrate Judge's own findings are inconsistent with the Recommendation."); *id.* at 7 ("Despite a contrary Recommendation, the Magistrate Judge's own findings support that Ms. Laurezo's waiver of rights was not made with full awareness of the right being abandoned and the consequences of such a decision."). However, the Court's analysis in weighing whether Ms. Laurezo was in custody is significantly different than the analysis required to conclude that she voluntarily,

knowingly, and intelligently waived her *Miranda* rights. Indeed, while the Court finds that Ms. Laurezo's cultural misunderstandings interfered with her ability to assess whether she was permitted to leave the Sheriff's Department, her cultural differences did not interfere to such an extent that she was unable to read the form provided to her and understand what the officers were saying. *See Zuhrieh*, 124 F.Supp.3d at 1192-93 (denying the defendant's argument that "his unfamiliarity with the Anglo-American legal tradition [made him] unable to appreciate the consequences of [his] decision," because "despite whatever anxiety [the defendant] might have felt, he was not so bereft of his linguistic faculties as to not understand the agents' inquires").

The Court appreciates that Ms. Laurezo may not be familiar with the American legal system. However, given Ms. Laurezo's long-term intimate relationships, dozens of text messages, and continued phone calls conducted entirely in English, the Court finds her argument that she did not comprehend the plain language of her *Miranda* waiver to be unpersuasive. As explained by this Court previously, "[t]here is no requirement that a suspect attain a mastery of constitutional law or criminal procedure prior to waiving his rights." *Zuhrieh*, 124 F.Supp.3d at 1193. Indeed, "the animating purpose of the demand that police inform suspects of their rights prior to questioning them is to apprise potential defendants of the rights relevant in the circumstances; the only legal knowledge required is, by design, transmitted by the warnings themselves." *Id.* at 1193-94.

Importantly, "[a] suspect need not [] understand the tactical advantage of remaining silent in order to effectuate a valid waiver." *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir. 1990). Rather, as long as the suspect "knew that he did not have to speak to police and understood that statements provided to police could be

used against him," the *Miranda* waiver is sufficient. *Id.* Thus, because Ms. Laurezo can read and write English at much greater than an elementary level, Ms. Laurezo has the capacity to understand the plain language used in the waiver to articulate her rights under the Fifth Amendment. *See contra United States v. Castorena-Jaime*, 117 F.Supp.2d 1161, 1172 (D. Kan. 2000) (finding defendant did not voluntarily waive his *Miranda* rights because the defendant never made "any sentences or meaningful expressions or words [] in English [], other than one time when he repeated back the question asked by the trooper").

In sum, the Court finds that Ms. Laurezo understands enough English to comprehend her Fifth Amendment rights and the plain language of the *Miranda* waiver. In addition, the Court finds that Ms. Laurezo's unfamiliarity with the American legal system does not render her unable to appreciate the consequences of the decision she was asked to make. Rather, Ms. Laurezo read the Advice of Rights form and it was also read aloud to her. (Doc. 36-1 at 8-16). Shortly after the interview started, Ms. Laurezo verbally confirmed that she speaks "pretty good" English. (Doc. 36-1 at 4). Whenever Ms. Laurezo expressed even a scintilla of doubt, the officers further explained the Advice of Rights form to her. (Doc. 36-1 at 9). Most pointedly, however, Ms. Laurezo gave both verbal and written confirmation that she understood each of her rights as they were read to her. (Doc. 8-16). Having found that Ms. Laurezo has the capacity to understand her Fifth Amendment rights, the Court concludes that Ms. Laurezo knowingly, intelligently, and voluntarily signed the *Miranda* waiver.

### III. Conclusion

For the foregoing reasons, the Court finds that the Chief Magistrate Judge correctly concluded that Ms. Laurezo was in custody during her July 3, 2018 interview and she voluntarily waived her Fifth Amendment rights. As such, both the Government and Ms. Laurezo's Objections are overruled.

**IT IS THEREFORE ORDERED** that Ms. Laurezo's *Motion to Suppress Statements*, (Doc. 27) is **DENIED IN PART** and the Chief Magistrate Judge's *Proposed Findings and Recommended Disposition*, (Doc. 69), is **ADOPTED WITH MODIFICATIONS** to reflect the suppression of Ms. Laurezo's statements that do not fall within the routine booking exception made before relinquishing her *Miranda* rights and the one factual discrepancy clarified herein.

**IT IS SO ORDERED**.

_____
UNITED STATES DISTRICT JUDGE